Filed 4/19/13  Gregorio v. Rust-Oleum Corp. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ANNE GREGORIO, | |
| Plaintiff and Appellant, | G046533 |
| v. | (Super. Ct. No. 30-2007-00031378) |
| RUST-OLEUM CORPORATION, | O P I N I O N |
| Defendant and Respondent. | |

Appeal from a judgment of the Superior Court of Orange County, Kim Garlin Dunning, Judge.  Reversed.

Kinkle, Rodiger and Spriggs and Janine L. Highiet-Ivicevic for Plaintiff and Appellant.

Walsworth Franklin Bevins & McCall, Karen M. Sullivan, Stephanie J. Rothberg and Sadaf A. Nejat for Defendant and Respondent.

\*          \*          \*

INTRODUCTION

Anthony Gregorio died of leukemia in 2007. Anthony's widow, Anne Gregorio,[1] contends Anthony developed leukemia as a result of work-related exposure to chemical products, including, but not limited to, two specific products manufactured by Rust-Oleum Corporation (Rust-Oleum). Rust-Oleum filed a motion for summary judgment, arguing Anne could not prove Anthony's exposure to Rust-Oleum's products; exposure is a necessary component of causation in a toxic tort case. The trial court granted the motion; Anne appeals.

We conclude that the evidence Anne offered in opposition to the summary judgment motion raised a triable issue of material fact as to Anthony's exposure to the Rust-Oleum products identified by Anne in the second amended complaint. We therefore reverse.

STATEMENT OF FACTS AND PROCEDURAL HISTORY

Anthony worked as a tool and die maker and manager at Instrument Specialties Company, Inc. (Instrument Specialties), from 1987 through 1997. From 1997 through 2005, Anthony worked as a production manager for Interplex Nascal, Inc. (Interplex). From 2005 through 2006, he was a tool and die department manager at Qualtek Manufacturing, Inc. (Qualtek). At each place of employment, Anthony allegedly worked with and was exposed to chemical products containing significant concentrations of benzene and other toxic chemicals. Anne alleged that, as a result of his exposure to these chemicals, Anthony developed acute myelogenous leukemia. He died in July 2007.

Anne and Christopher sued Rust-Oleum, among many other manufacturers of chemical products, for negligence, strict liability, fraudulent concealment, and breach of implied warranties. In the complaint, it was alleged that Anthony had been exposed to

---

[1] In this opinion, we will refer to Anthony Gregorio, Anne Gregorio, and Christopher Gregorio (Anthony's son) by their first names to avoid confusion; we intend no disrespect.

Industrial Choice Aerosol—Topcoats, manufactured by Rust-Oleum, as well as "other products to be determined during discovery." The original complaint was filed in December 2007, and a first amended complaint was filed in August 2008. Christopher dismissed his claims against Rust-Oleum, with prejudice, in January 2011.

In a verified supplemental response to a joint product identification and exposure fact sheet, Anne stated that Anthony had been exposed to Rust-Oleum's Industrial Choice Aerosol—Topcoats while working at Qualtek.

In March 2011, Rust-Oleum filed a motion for summary judgment or, in the alternative, summary adjudication. The motion was originally scheduled for a hearing in June 2011. Pursuant to Anne's request to conduct additional discovery, the trial court continued the date for the hearing to September 2011. In August, the court granted another request to continue the summary judgment motion hearing to October 2011, to allow Anne to conduct further discovery. The court also ordered Anne to file a second amended complaint removing her claims for punitive damages, fraudulent concealment, and breach of implied warranties, and removing reference to dismissed defendants, by the end of August 2011.

On August 31, 2011, Anne filed her second amended complaint. The second amended complaint added a new product manufactured by Rust-Oleum— Industrial Choice 1600—to which, Anne alleged, Anthony had been exposed, and which, Anne further alleged, had proximately caused Anthony's injuries. Nothing in the appellate record shows Anne sought or obtained leave of court to amend the complaint to add a new product after Rust-Oleum's motion for summary judgment had been filed. By the same token, nothing in the appellate record shows Rust-Oleum ever objected to the addition of new material facts to the complaint while its motion was pending. Therefore, we will treat the motion for summary judgment as being directed at the second amended complaint. In practical effect, this is the same approach used by the trial court and the parties.

3

Anne requested a further continuance of the summary judgment motion hearing; the court granted the request, setting the hearing for November 2011. On November 3, 2011, one day before filing her opposition to the summary judgment motion, Anne served a second supplemental response to the joint product identification and exposure fact sheet. (The second supplemental response was not verified; Rust-Oleum did not raise any objection to either the lack of verification or the lateness of the response.) In the second supplemental response, Anne mentioned only Industrial Choice Aerosol—Topcoats (not Industrial Choice 1600) as a Rust-Oleum product to which Anthony had been exposed. The second supplemental response stated that Anthony had been exposed to that product not only at Qualtek, but also at Instrument Specialties and Interplex.

After a hearing, the trial court granted Rust-Oleum's motion for summary judgment. Judgment was entered, and Anne timely appealed.[2]

DISCUSSION

I. *STANDARD OF REVIEW*

"A trial court properly grants summary judgment where no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law. [Citation.] We review the trial court's decision de novo, considering all of the evidence the parties offered in connection with the motion (except that which the court properly excluded) and the uncontradicted inferences the evidence reasonably supports. [Citation.]" (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476.)

---

[2] The notice of appeal was purportedly filed by Anne and Christopher. However, because Christopher had dismissed his claims against Rust-Oleum, with prejudice, earlier in the litigation, the motion for summary judgment was made only as against Anne, and judgment was entered only as against Anne.

4

Code of Civil Procedure section 437c, subdivision (p)(2) provides: "A defendant . . . has met his or her burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete defense to that cause of action. Once the defendant . . . has met that burden, the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto. The plaintiff . . . may not rely upon the mere allegations or denials of its pleadings to show that a triable issue of material fact exists but, instead, shall set forth the specific facts showing that a triable issue of material fact exists as to that cause of action or a defense thereto."

## II. *THE TRIAL COURT ERRED IN CONCLUDING ANNE FAILED TO RAISE A TRIABLE ISSUE OF MATERIAL FACT.*

Rust-Oleum's motion for summary judgment was based on whether Anne could prove causation. In a toxic tort case, such as this one, causation is an essential element, whether the theory pled is negligence or strict liability. (*Setliff v. E. I. Du Pont de Nemours & Co.* (1995) 32 Cal.App.4th 1525, 1533-1534.) Before fully entering into an analysis of causation, a plaintiff must establish exposure to the product he or she contends caused the injury. (*Hunter v. Pacific Mechanical Corp.* (1995) 37 Cal.App.4th 1282, 1284.) "If there has been no exposure, there is no causation." (*McGonnell v. Kaiser Gypsum Co.* (2002) 98 Cal.App.4th 1098, 1103.)

### A. *Rust-Oleum's motion for summary judgment shifted the burden of showing a triable issue of material fact on exposure.*

Anne's first amended complaint, as supplemented by her first supplemental response to the joint product identification and exposure fact sheet, alleged that Anthony was exposed to Industrial Choice Aerosol—Topcoats at Qualtek. In its motion for summary judgment, Rust-Oleum successfully shifted the burden to Anne by offering

admissible evidence that Anthony was not exposed to Industrial Choice Aerosol—Topcoats at Qualtek, as follows:

1. Anthony Fagnant, the chief executive officer at Qualtek since 2000, testified at a deposition he had no information that any Rust-Oleum products were used at Qualtek, or that Anthony would have been exposed to any Rust-Oleum products while employed there.

2. Amber Sims, who briefly worked with Anthony at Qualtek, testified at a deposition that she was not familiar with Rust-Oleum, and had no knowledge that Anthony worked with or around any Rust-Oleum products while employed by Qualtek, including, but not limited to, Industrial Choice Aerosol—Topcoats.

3. Rust-Oleum had no records of any sales of its products, including Industrial Choice Aerosol—Topcoats, to Qualtek.

4. Fagnant testified that Qualtek's material safety data sheets and inventory lists identifying Rust-Oleum products meant only that such products were currently in use at Qualtek, but did not mean that they were used at Qualtek in 2005 or 2006.

5. Richard Wilcox, who worked with Anthony at Interplex from 1999 through 2005, testified at a deposition that he could not recall any Rust-Oleum products being used at Interplex, could not recall Anthony using any Rust-Oleum products at Interplex, and had never heard of Industrial Choice Aerosol—Topcoats.

6. Debra Yost, the head of human resources for the successor in interest to Instrument Specialties, testified as the person most knowledgeable at Instrument Specialties. Yost had no knowledge of which companies supplied chemical products to Instrument Specialties while Anthony was employed there, nor was she able to identify anyone who would have that information.

B. *Anne successfully showed a triable issue of material fact on exposure.*

As noted *ante*, the second amended complaint added a new Rust-Oleum product as an alleged cause of Anthony's injuries—Industrial Choice 1600. Additionally,

the second supplemental response to the joint product identification and exposure fact sheet added Instrument Specialties and Interplex as sites where Anthony was allegedly exposed to the chemicals causing his injuries. Rust-Oleum did not object to Anne's amendment of the complaint or to the joint product identification and exposure fact sheet filed after the motion for summary judgment.

As explained in detail *post*, the deposition testimony of Richard Shearer, offered by Anne in opposition to the motion for summary judgment, was sufficient to raise a triable issue of material fact as to Anthony's exposure to Rust-Oleum products while working at Instrument Specialties. For purposes of this opinion, we need not consider the deposition testimony of Scott Drouin, who worked with Anthony at Interplex, or the declaration of Michael Williams, who worked at Qualtek, but who may have worked there only after Anthony had left the company. For this reason, we need not address the separate issue raised by Anne on appeal that the trial court erred by excluding the Williams declaration on grounds of relevance, speculation, lack of foundation, and immateriality.

Shearer worked with Anthony at Instrument Specialties from 1993 through 1996. Shearer identified Rust-Oleum products used at Industrial Specialties. Shearer personally saw Anthony use Rust-Oleum products during his employment at Instrument Specialties to "paint[] the size of the dies themselves so we can identify the customer, who the die went to, and the product line." Shearer could not be more precise about the specific Rust-Oleum products to which Anthony was exposed.

The question we face is whether Anne raised a triable issue of material fact through Shearer's testimony that he personally observed Anthony using Rust-Oleum products in the course of his work at Instrument Specialties, although Shearer could not identify either Industrial Choice Aerosol—Topcoats or Industrial Choice 1600 as the specific product Anthony used. We conclude she did so.

7

Rust-Oleum contends that the trial court sustained one or more of its objections to the testimony of Shearer. In this regard, the minute order reads as follows: "Based on depositions conducted while this motion was pending (witnesses Shearer and Drouin), plaintiff failed to produce admissible evidence that would create a triable issue of material fact as to decedent's exposure to moving party's product." We disagree with Rust-Oleum's interpretation of the minute order. The minute order does not state that the testimony of Shearer and Drouin was inadmissible; to the contrary, it states that even if that testimony is considered, Anne has not produced admissible evidence to create a triable issue of material fact. Our conclusion is bolstered because (1) the minute order sustained objections to the Williams declaration, which shows the court knew how to clearly sustain objections to evidence when it chose to do so, and (2) the court did not use the proposed order regarding Rust-Oleum's evidentiary objections, which would have shown clearly which portions of Shearer's testimony were being excluded and why. Code of Civil Procedure section 437c, subdivision (c) provides that the trial court must consider all evidence offered by the parties, except evidence to which an objection has been *made and sustained*. (See *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 526.) And, on appeal, this court must conclude the trial court considered all evidence to which an objection was not specifically sustained. (*Id.* at pp. 526-527.) Therefore, we reject Rust-Oleum's contention that we must not consider Shearer's testimony because the trial court sustained one or more objections to it.

Rust-Oleum's objections to Shearer's testimony, however, are preserved on appeal. (*Reid v. Google, supra,* 50 Cal.4th at p. 534.) Rust-Oleum argues on appeal (as it did in the trial court) that Shearer's testimony was irrelevant, vague, speculative, and lacking in foundation because Shearer could not identify the specific Rust-Oleum product that he had observed Anthony using, and Shearer was unfamiliar with the Industrial Choice Aerosol—Topcoats and Industrial Choice 1600 products. We reject

8

Rust-Oleum's evidentiary arguments. Those arguments address whether the evidence creates a triable issue of material fact, not its admissibility.

Rust-Oleum contends that Shearer was not able to identify the specific Rust-Oleum product or products used at Instrument Specialties from pictures shown to him at his deposition, and specifically that he could not identify a picture of a can of Industrial Choice 1600. The evidence contained in the appellate record does not support Rust-Oleum's argument, however. At the second session of Shearer's deposition, Rust-Oleum's counsel questioned Shearer as follows:

"Q. You've heard of a company called Rust-Oleum Corporation?

"A. Yes, I have.

"Q. Have you ever personally used Rust-Oleum?

"A. Yes, I have.

"Q. Have you personally used the product?

"A. Yes.

"Q. Did you ever use any Rust-Oleum products when you worked at Instrument Specialties?

"A. I didn't, no.

"Q. Did you ever see anybody else who worked at Instrument Specialties ever use a Rust-Oleum product?

"A. Yes.

"Q. And what product did you see used?

"A. Spray can.

"Q. Aside from a spray can, did you ever see any other Rust-Oleum products used at Instrument Specialties?

"A. No, I did not.

"Q. And did you ever see Mr. Gregorio ever use the Rust-Oleum spray can?

9

"A. Yes.

"Q. What do you mean by Rust-Oleum spray can?

"A. Spray paint.

"Q. Did you actually ever see the actual container of the Rust-Oleum spray paint?

"A. Yes, I did.

"Q. . . . [¶] When did you see Mr. Gregorio use Rust-Oleum spray paint?

"A. Probably weekly.

"Q. When's the first time that you remember seeing him use Rust-Oleum spray paint?

"A. During the first week he was there. It was standard procedure.

"Q. What do you mean by it was standard procedure?

"A. One of the identifications we used for our tools was we painted the tools the color of the customer. All our customers were color coded.

"Q. And when you say 'tools,' what do you mean by tools?

"A. Stamping dies.

"Q. So do you have a specific recollection of any time that you actually saw Mr. Gregorio using Rust-Oleum spray paint?

"A. Yes.

"Q. When was that?

"A. When he was building a new die.

"Q. And building a new die would depend on different projects and different customers that you had?

"A. Yeah. The customer requirements were our requirements. Our customers had different colors, and if the customer paid for it, we painted their color on there so we could identify their tools. If it was our tool, we painted it red. That was our color.

10

"Q. Did you ever actually see the actual can of Rust-Oleum spray paint that Mr. Gregorio was using?

"A. Yes.

"Q. Can you describe what it looked like?

"A. Oh, jeez. White with the Rust-Oleum logo on the front of it, red and orange or red and yellow I guess is what it is, with the name Rust-Oleum on the front and the color cap and some boilerplate in the back of the can. I guess there were safety—how to use it, things like that.

"Q. Where was the red and yellow located on the can?

"A. On the cap. And I think—you mean on the can? It was part of the 'O,' if I remember correctly, in Rust-Oleum.

"Q. And what did the Rust-Oleum—what color was that, that lettering Rust-Oleum?

"A. I believe it was black.

"Q. Do you remember any other writing on the can of Rust-Oleum spray paint?

"A. The boilerplate in the back of it and then, you know, the size or the volume of the can. I'm sure there was some other things on there, but I distinctly remember their Rust-Oleum logo on there, which is the rust and big 'O' and then leum on there. [¶] . . . [¶]

"Q. Do you remember—you called it boilerplate. Do you remember what any of that language said?

"A. No.

"Q. Do you know what size can that you saw?

"A. No.

"Q. Do you remember any other colors, symbols or writing other than what you've already just testified to with regard to the Rust-Oleum spray paint?

11

"A. They've changed their colors and labels since then, but I don't remember anything else about that.

"Q. [¶] . . . [¶] Do you know what color Rust-Oleum spray paints Mr. Gregorio used?

"A. I would say prevalent was red. The next biggest customer was yellow. So he used that. We had blue, green, purple. We even had pink, white and orange. I think those are the colors he used.

"Q. Do you know if any other brands or manufacturers' spray paint was used at Instrument Specialties during the time that you worked there?

"A. No. Because we used Rust-Oleum because it was used for metal."

At the fourth session of Shearer's deposition, the following colloquy occurred between Rust-Oleum's counsel and Shearer:

"Q. . . . Are you familiar with a product called Industrial Choice Aerosol Topcoats?

"A. No, I am not.

"Q. Okay. Now, can you turn to F. Just going back to the Industrial Choice Aerosol Topcoat, you have no information that Mr. Gregorio worked with or around that product; is that correct?

"A. That doesn't sound familiar to me.

"Q. Now, can you turn to F-43?

"A. Okay.

"Q. You marked this product as a product you were familiar with from Instrument Specialties; is that correct?

"A. Yeah, Rust-Oleum.

"Q. And you just marked this product because you were familiar with the name Rust-Oleum, not because you were familiar with that particular product; is that correct?

12

"A. I assumed it was paint.

"Q. So is that correct that you only marked this because you're familiar with Rust-Oleum; correct?

"A. Yes.

"Q. Not the product itself?

"A. Yes.

"Q. And so you have no information as to what this product is; is that correct?

"A. That's correct.

"Q. And you have no information that Mr. Gregorio worked with or around this specific product; is that correct?

"A. That's correct."

The document that was marked as exhibit F, which apparently had pictures of various products on it, is not included in the appellate record. We therefore have no way of knowing whether the picture to which Shearer referred in this excerpt is a picture of Industrial Choice 1600, Industrial Choice Aerosol—Topcoats, or something else entirely. Further, we have no way of knowing whether Shearer ever had in front of him a picture of Industrial Choice 1600 or Industrial Choice Aerosol—Topcoats. Although Shearer was shown a series of pictures of various products at an earlier session of his deposition (the pictures were marked collectively as exhibit D), the thumbnail pictures of what appear to be Rust-Oleum products are not legible; we cannot determine which Rust-Oleum products are featured and which are not.[3]

_____

[3] Page 6 of exhibit D has thumbnail pictures of seven products which may or may not be Rust-Oleum products; the labels are completely illegible, but the thumbnail pictures bear the following identifying marks: "Rusat 2"; "rust202218_R55906"; "Rust 1"; "Rust 2"; "Rust 3"; "Rust 4"; and "Rust-Oleum Industrial Choice-1600." Nowhere in the appellate record can we find any testimony that the final product mentioned is, in fact, a correct photograph or representation of the Industrial Choice 1600 product alleged to have caused Anthony's injuries.

Even aside from the absence of exhibit F and the problems of illegibility, we do not read Shearer's deposition testimony, in context, as stating unequivocally that Anthony was not exposed to either of the subject Rust-Oleum products. Shearer's testimony, in context, supports Anne's contention that Anthony was exposed to Rust-Oleum spray can paint at Instrument Specialties.

Therefore, we conclude that Anne raised a triable issue of material fact as to Anthony's exposure to either Industrial Choice 1600 or Industrial Choice Aerosol—Topcoats while employed at Instrument Specialties. The trial court erred in granting Rust-Oleum's motion for summary judgment.

DISPOSITION

The judgment is reversed. Appellant to recover costs on appeal.

FYBEL, J.

WE CONCUR:

MOORE, ACTING P. J.

THOMPSON, J.

14